JEREMIAH UPDIKE ET AL., EXECUTORS OF JOHN D. W. TEN BROECK, DECEASED, v. RALPH V. D. TEN BROECK.

1. When a summons was prepared and sealed by an attorney, in the usual manner, as agent of the clerk of the court, and suffered to remain upon his table without being given to the sheriff, while awaiting an answer to a proposal for an arbitration, and was afterwards served prior to the term to which it was returnable, it was *held*—that the making and sealing the writ by the attorney, in good faith, and for the purpose of having it served, was the commencement of the suit, although the time within which the suit could be brought, so as to avoid the statute of limitations, had passed, before the summons had actually been placed in the hands of the sheriff for service. The court did not err in refusing to nonsuit, on the ground that the action was barred by the statute.

2. An action by a son against the estate of his deceased father, for compensation for services rendered after he became of age, may be maintained, when it is shown that the work was done under an agreement made between the father and son, that the son should be satisfied for his services at the death of the father. Such a contract need not be in writing.

3. If a full performance of the contract is rendered impossible by the father turning the son away, a recovery for the services rendered under it can be had upon the common counts. When the suit is not brought upon a special contract, but on the ground that the contract was repudiated, an allowance of interest from the end of each year's service is usual and right.

In *assumpsit*.    Error to the Circuit Court of Somerset.

The action was brought by the plaintiff below against the executors of the estate of his father, to recover compensation for work and labor performed for his father, upon a contract made after he became of age. A verdict was rendered for the plaintiff. On the trial, various exceptions were taken by the defendants to the ruling of the court, and were afterwards brought before this court by writ of error.

The case was heard before Justices HAINES, ELMER and BEDLE.

For the plaintiff in error, *James Wilson*.

For defendant, *J. F. Hageman* and *J. P. Bradley*.

The opinion of the court was delivered by

BEDLE, J.   The first question to be considered is, whether the suit was brought within the time required by law.   The executors, on the first day of June, 1858, obtained an order from the Orphans Court for the creditors to bring in their claims within nine months.   The plaintiff's claim was presented within the time, but the executors, on the second day of April, A. D. 1859, gave him a notice in writing, under the second section of the "act for the relief of legatees and next of kin in the recovery of legacies and distributive shares," approved February 28th, 1849, *Nix. Dig.* 281,* that his claim was disputed.   The plaintiff was then required by that section to bring his suit for his claim in three months from the time of giving such notice, or be prevented by the decree barring creditors from any recovery against the executors, the same as if the claim had not been presented within the time so limited by the court.   The executors pleaded the order to limit creditors; also, that the suit was not commenced within the three months, and also the decree barring creditors.   The notice was given April 2d, 1859, and the summons is tested the twenty-fifth day of June, 1859. This time is within the three months; but it is urged by the executors that, although the summons is so dated, and was actually made out on that day, yet that it remained in the office of the attorney over two months, and after the three months had expired, before it was sent to the sheriff for service, awaiting the answer upon a proposal from the plaintiff's attorney to refer the claim to arbitration.   The facts upon this subject are all contained in the testimony of John F. Hageman, Esq., the plaintiff's attorney.   He testifies that after the notice was served, he was directed to commence suit against the estate; that he did not issue the writ immediately, but, being at Somerville, he saw Judge

* *Rev., p.* 764.

Brown, then the attorney of the executors, and proposed to him to refer it to arbitrators. Mr. Brown said he would see Mr. Updike, one of the executors, or would consult the executors and let him know; that next he saw Mr. Updike in Princeton, and expressed regret to him that he had to bring suit, who informed him that he had heard nothing of the proposition; that he then told Updike that he would have to bring the suit, unless it was referred to arbitrators; that Mr. Updike was to see Mr. Brown, and talk it over with him, and give him an answer; that, not hearing from Mr. Updike, and being about to go on an excursion to Niagara, he drew and sealed the writ on the twenty-fifth of June, 1859, returnable at the October Term of Somerset Circuit, and left it upon his table; that it was made out in good faith, tested and sealed, to be served, and that purpose never abandoned, and would have been sent to the sheriff before, had he not felt bound to wait for a definite answer on the subject of the arbitration; that he had promised Mr. Brown and Mr. Updike to wait for an answer until he heard from them on that proposition; that he returned from Niagara about the 12th July, and pretty nearly two months after, but before the October Term, Mr. Updike informed him that they had decided not to leave it to arbitrators, and thereupon he sent the same writ to the sheriff. The court was asked to non-suit, upon the ground that under these facts, the action was not commenced within the time required by law. Could the jury legally find, from these facts, that the suit was commenced within the required time? Previous to the "act to simplify the pleadings and practice in courts of law," approved March 17th, 1855, writs were tested of the term preceding the return, without reference to the day they were actually issued. Whenever it was necessary to determine the time of the commencement of the suit, the court would look for the day the writ was actually issued or sued out. The first case reported is in *Pennington*, p. 229, *Wambough* v. *Schenck*. The plaintiff claimed dower out of her husband's estate,

upon the ground of his absence from the state for seven years. It was urged that the suit was commenced too soon, the writ bearing teste May Term, 1806, which would be before the seven years had elapsed; but the court regarded the suit as commenced at the actual time of suing out the writ, which was about three months after the teste. The next case is *Allen and others* v. *Smith*, 7 *Halst.* 160. One of the questions was whether the suit had been commenced before a debtor had gone off the limits, or in other words, before the cause of action had accrued. The writ bore teste of the preceding term, and anterior to the.time the cause of action arose. Yet to determine when the suit was commenced, the court evidently regarded the time of the issuing of the writ, or when it was actually sued out, as the commencement of the suit. In the case of *Whitaker* v. *Turnbull*, 3 *Harr.* 174, Hornblower, C. J., used this language : " That when a writ is issued out of the office of the clerk, or of the attorney acting, as is usually the practice in this state, (at least permissively,) as the agent or deputy of the clerk, in good faith, for the purpose of being served, or proceeded on, and that purpose is not afterwards abandoned, it is for all material purposes, the actual commencement of the suit." It was necessary in this case to ascertain when the suit was commenced, in order to determine the admissibility of a note claimed as an off-set, which the defendant had obtained between the time the writ was actually issued, or sued out, and the time of the acknowledgment of an appearance upon the writ by the defendant's attorney. The off-set was disallowed, and the suit held to be commenced at the time of the issuing of the writ. These cases then establish the general doctrine, that the issuing or suing out of the writ is the commencement of the suit. This could always be shown under the former practice, notwithstanding the teste was of a different time. Section 1, of the act of March 11th, 1855, altered the practice of testing writs of the preceding term, and required that they should " bear date on the day on which the same shall be issued, and the date

shall be *prima facie* evidence that they were issued on that day, but such date may be disproved whenever the same shall come in question." The chief object of that act was to fix a definite time for the commencement of actions, adhering to the law, as already declared by the courts, that the issuing of the writ was the commencement of the action, and also to have it inserted in the writ as a matter of record, and making that date as *prima facie* evidence of its truth. The writ under that act, must be regarded as the commencement of the suit from the time it was issued. And the date, in the absence of evidence to the contrary, is considered the true time. The English Uniformity of Process act, of 2 *William IV., c.* 39, required that writs issued by authority of it, should bear date on the day on which the same were issued. Under that act, writs of summons and capias were required to be tested the same as our act now requires. In referring to that act, Chitty says, (1 *Chitty's Pl., p.* 259,) since that act " all the new writs are considered the commencement of the action, and not, as before, mere process to bring the defendant into court; so that now, if the writ be issued before the cause of action is complete, the plaintiff would be non-suited if the defendant plead so as to raise the objection." He further says (*p.* 260): " It is also essential that no material fact be stated, in the declaration, to have happened after the date or teste of the writ, which is now in all cases considered the commencement of the action, and cannot legally be issued until after the cause of action is complete." So under our act the cause of action must be complete at the time the writ is issued. And the date or teste must be considered as the commencement of the suit, unless it is untruly made. The issuing of the writ under the act of 1855 contemplates no act outside of the clerk. The dating and the issuing are necessarily cotemporaneous, and each is the act of the clerk. He issues the writ, and puts in the date he does it. It is true, that the simple arbitrary act of a clerk in making out a writ would not be considered as the commencement of the suit; and, therefore, what he does

must be for a suitor, for the purpose of being served or proceeded on. The writ must be issued for a suitor, to be proceeded on. If the clerk then signs, seals and completes it, it is a perfect writ, ready for service, so far as his duties are concerned, for a suitor who intends it to be served or proceeded on. The writ is issued under the act, whether it has actually been delivered to the party or remains in the clerk's office awaiting the delivery to the party, his attorney, or the sheriff. The effect of this issuing may depend upon the subsequent conduct of the party. He may abandon it, but if he does not, the writ has effect from the time it was so issued. If the summons in this case had been obtained by the attorney, from the clerk's office, there would have been no doubt, under our act, that the writ was issued, but the difficulty arises from the fact that he signed and sealed it in his own office and kept it there. The habit of attorneys, as agents of the clerks, issuing writs, has been so long followed and recognized in the daily practice of the courts, that it ought not now to be suddenly interfered with. It is certainly liable to abuse, yet we must now treat a writ made out by the attorney, the same as if made out by the clerk; trusting not alone to the penalty of the statute, but also to the integrity of the bar, so well maintained as it always has been here, to save us from any serious abuse. This writ Mr. Hageman swears was made out, in good faith, to be served, and that that purpose was not abandoned. The jury could certainly believe that, from the circumstances alone of this case. The plaintiff was obliged to commence his suit within a certain time, or be barred as against the executors. The suit was a necessity to save the claim from the effect of the statute. The right of action had accrued before the claim was presented; the plaintiff was under no obligation to wait until he had received an answer about the arbitration; the answer could not in any way affect his right of action; there was no uncertainty about that; that had become fixed, if any existed, long before. It was the duty of the attorney to save the claim from being barred. He made

out the writ, signed and sealed it in the usual way, intending it to be served or proceeded on, and thereby to save the claim. He clearly intended to commence the action before it was too late. With such a purpose, that writ was as much issued when it was signed and sealed, as if the clerk had done it and delivered it to him. This is not a case where there is any allegation of fraud, but the jury could not, from the evidence, conclude otherwise than that the writ was signed and sealed in good faith, to be served. With the writ so issued, was there any abandonment of it afterwards? Any abandonment of the purpose to use it or proceed upon it? There was certainly no obligation on the part of Mr. Hageman to desist from its use, and thereby deprive the plaintiff of a remedy. It was returnable at the October Term, and could be served as well a week before that term as when it was made out. Whatever facts may be necessary to constitute an abandonment, it is clear that the delay of the plaintiff to have the writ served, because he felt bound, not legally, but only by courtesy, to wait for an answer on the subject of arbitration, did not work an abandonment of the writ. That delay was not inconsistent, in any way, with the intention of issuing the writ to have it prosecuted, and it is in no way an abandonment of the writ. Neither would the delay have anything to do with the plaintiff's right of action. That could not be affected by it. The cases referred to by the counsel of the executors are chiefly, if not all, where the writ was obtained preparatory to a cause of action, and its use was depending upon a certain state of facts, existing or not when it was used, going to the right of action. In these cases the courts held the suit as commenced not until the writ was actually used, and after the cause of action had become fixed. Such are the cases of *Visscher* v. *Gansevoort*, 18 *Johns.* 496; *Bronson et al.* v. *Earl*, 17 *Johns.* 63; *Ross* v. *Luther*, 4 *Cowen* 158; *Boughton* v. *Bruce*, 20 *Wendell* 234; *Burdick* v. *Green*, 18 *Johnson* 20.

Such also is the case of *Seaver* v. *Lincoln*, 20 *Pick.* 267.

None of these reach the case before us. The cause of action was not depending upon the answer for which the

plaintiff was waiting   The case of *Brown* v. *Van Duzen*, 11 *Johnson* 472, also referred to by the executors' counsel, has no application to the question we are now considering.   It was brought upon a recognizance, under a plea of title, before a justice.   The breach alleged was, that the defendant did not appear and put in bail to a suit commenced against him by the plaintiff.   The court doubted whether merely issuing the writ, and delivering it to the sheriff to be served, without actual service, and without an *alias* and *pluries capias* could be deemed a commencement of the suit in the sense of this recognizance, but held that, at least, it must be delivered to the sheriff with a *bona fide* intention of having it served. Notwithstanding these cases, the general doctrine is held in New York, that the issuing of the writ, for all essential purposes, is the commencement of the suit.   *Carpenter* v. *Butterfield*, 3 *Johns. Cas.* 145 ; *Lowry* v. *Lawrence*, 1 *Caines* 69-72 ; *Boice* v. *Morgan*, 3 *Caines* 133 ; *Bird et als.* v. *Caritat*, 2 *Johns.* 346 ; *Cheetham* v. *Lewis*, 3 *Johns.* 42 ; *Waring* v. *Yates*, 10 *Johns.* 119 ; *Ex parte Dow*, 1 *Cowen* 205.

And in Massachusetts the general doctrine is held that the day of the date of the writ is the commencement of the action, and particularly so where the statute of limitations is in question, unless it should appear that the date was untrue.   *Gardner* v. *Webber*, 17 *Pickering* 407 ; *Bunker* v. *Shed*, 8 *Metcalf* 151.

The writ in this case was clearly issued on the twenty-fifth day of June, 1859, before the three months had expired, in good faith, to be prosecuted, and that purpose was never abandoned, although the service was delayed to hear from the executors or their attorney.

The suit was commenced when the writ was issued—the date is *prima facie* evidence that it was then issued, and there are no facts to contradict it, or to show that the attorney of the plaintiff intended otherwise than that it should be an actual suit for the claim.   Any suit is liable to be defeated by arbitration or settlement, and efforts of a party to these ends are not to be used to his disadvantage, where the time within which a service is to be made has not expired. The court did right in refusing a non-suit upon this ground.

The other objections relate to the *merits*. The full charge is not given, and the extracts from it, contained in the exceptions, are so disconnected that it is difficult to tell the precise views of the judge, as connectedly bearing upon the case. We can only now inquire whether there is any error shown in what the bills of exception set out. The claim of the plaintiff is upon the common counts for work and labor for his father, the testator, between the time he came of age, in the year 1831, and about the year 1839. The father died in 1858. This suit is against his executors. Among other witnesses, the plaintiff produced Jack Ten Broeck, a colored man, who was born and brought up at the testator's, and Daniel Voorhees, who had been a ward of the testator. In relation to the testimony of these two witnesses, the court charged the jury as follows: "But if you believe Jack or Mr. Voorhees, then the old gentleman did make a contract with the plaintiff, and in so doing, the relation of parent and child ceased, and that of master and servant commenced to exist, and after that the plaintiff was laboring for the father under a contract;" to which the counsel of the executors excepted, "for the reason that said Voorhees proved no contract between said parties, and his evidence tended to show that no contract was made between the parties." The testator had raised a family of seven children, four sons and three daughters. At the time the plaintiff came of age, in 1831, two of the daughters had married and moved away, and also two of the sons, so that the family of the testator then consisted of Van Dyke, (the plaintiff,) Abraham, and Mary, (two sons and one daughter.) About this time, also, the wife of the testator died. Abraham farmed a little; his health was not good, and he went to teaching school. He afterwards, in or about the year 1842, died. Mary kept house until she married, in 1837. Van Dyke farmed and went ahead. Voorhees boarded with the testator, who was his guardian, part of the time. He was there in 1831, 1832, and 1833, and heard conversations between the testator and Van Dyke during those years. He says: "I often heard

the old man say he could not spare Van Dyke; he was the only one he could put dependence on. I often heard the old man say he meant to satisfy Van Dyke in some way; he did not say how; he always said Van Dyke should have the farm after his death; this was his intention. I don't remember in what way he said it; it was because he stayed at home and worked for him, and was a good boy. Van Dyke often spoke of going to his uncle Ruliff's; the old man said he could not spare him. I heard the old man say, Van Dyke should have the farm at his death; he said he would satisfy him in some way at his death; don't recollect that he mentioned the word will; this was in connection with Van Dyke going to his uncle Ruliff's; the conversations I heard between Van Dyke and the old man were in the house and in the wagon-house." Upon the cross-examination, he further says: " I understood from their conversations that the farm would be left to Van Dyke, charged with legacies to his other children. I understood from their conversations that the old man could make what will he pleased, but that Van Dyke was to have the farm, by paying out legacies; I never heard of the terms on which Van Dyke was to stay home, except that he would satisfy him at his death; when I heard the father talk about the will, I understood that this was the way he was to be satisfied; when Van Dyke talked of going north, he, the old man, said he would satisfy him some day for his labor; he intended Van Dyke to have the farm after he was done with it; I heard them speak together twice, once at the house, and once at the wagon-house; he said pretty much the same thing both times."

Although this testimony is not as distinct as the testimony of Jack, and the daughter, Mary, yet it sufficiently shows, if believed, that Van Dyke was not working at home as an unemancipated child, trusting to the generosity of his father alone, but that he was working as a servant, under the promise of compensation. Van Dyke talked of going away ; the father could not spare him; he said he would satisfy him in some way for his labor; that he should have the farm at his death,

or that he intended him to have the farm after he was done with it. These are the circumstances under which the son worked, as sworn to by Voorhees. And when Mrs. Reiley (Mary) left, in 1837, she left him in the entire charge. Although the law presumes that the relation of parent and child exists in the absence of any arrangement to the contrary, when the child continues in the service of the parent after full age, as before, yet that relation ceases when it is shown that compensation was to be made, and that it was so expected by both parties; or that the services were performed under such circumstances as that the expectation was reasonable and proper. *Ridgway* v. *English*, 2 *Zab.* 423. This promise to satisfy Van Dyke, and that he should have the farm at his death, was made during the rendering of the service. And it appears fairly, from the evidence of Voorhees, that the services were performed upon the faith of the promise. This evidence repels the idea that the services were gratuitous. *Smith* v. *Adm'rs of Smith*, 4 *Dutcher* 216; *Ridgway* v. *English*, 2 *Zab.* 424. The court was right in charging, that if the jury believed Voorhees, the plaintiff was laboring under a contract.

The *character* of the contract will next have to be inquired into, under the second exception, which is, " that it was not necessary that the contract in this case should have been in writing: and that it has the same legal effect as if it were in writing, if the jury believed the witnesses." Jack swears, " when Van Dyke came of age, there was a conversation between him and his father. He said to his father, I want to go away; father said, what do you want to go away for? Van Dyke said, I want to go away to do for myself; he said, all the rest of them are doing for themselves, and I want to do for myself, too; the old man then made the reply, I can't spare you; you're the only boy who'll work; I can't spare you; I have a large farm; I am getting old; as long as I live, I'll keep the loaf under my own arm; when I die you shall be well paid. Van Dyke stayed; he went to work just the same as if it was his own; I suppose I thought

the old man would give it to him." Voorhees and Mrs. Reiley are the witnesses of the plaintiff who speak of a contract. They satisfactorily show that Van Dyke was to remain with his father while he lived, and that he should be compensated. The only difference in the evidence of Jack and that of Voorhees and Mrs. Reiley is this: in the evidence of Jack it might be said that the promise was to pay generally at the testator's death, and in the others, that he was to be paid by a devise of the farm. The testimony of Jack is not inconsistent with this idea; for, I think, the fair implication from it is, that Van Dyke was to be paid by the farm; but if the evidence of Jack is to be taken as showing a contract to pay generally at the testator's death, such a contract was not necessary to be in writing, so far as the claim of the plaintiff is concerned. The court, by referring to exceptions three and four, put the plaintiff's right of recovery upon the question whether the father told Van Dyke to go away. Jack swears that the testator "ordered him away—he drove him away; he told Van Dyke he must go." In exception four, it appears that the judge told the jury that if they believed the father did not tell the plaintiff to go, then the plaintiff *cannot* recover. Now, taking it as a contract to work for the father while he lived, to be paid at his death, it would not be void by the statute of frauds, as a contract not to be performed within a year. It comes within those cases where the agreement depends upon a contingency which may happen within the year. The testator might have died within the year and compelled the performance of the contract. *Brown on Frauds*, § 273-4-5-6, and the cases referred to.

If the testator turned the plaintiff away, so that he could not perform that contract, then the plaintiff could maintain his action for his labor already performed, and upon the common counts. *Story on Contracts*, § 972; 1 *Parsons on Contracts*, 527, *note V.*, and cases there cited.

And even if such a contract was void by the statute of frauds, if the testator was in fault by turning the plaintiff away, the suit could be brought for the services rendered,

under the common counts. *Smith* v. *Adm'rs of Smith*, 4 *Dutcher* 217 ; *Brown on Frauds*, § 118.

And some cases go so far as to allow the plaintiff to recover for *personal services*, when there is only a part performance of a contract, not to be performed within a year, and he himself has repudiated it. *Brown on Frauds*, § 122.

Upon this point it is not necessary now to express any opinion. But if the contract was, that Van Dyke should serve his father while he lived, and at his death be paid by a devise of the farm, which, I think, is the true construction of the evidence, then, so far as this suit is concerned, it has as much legal effect orally as if in writing. Such a contract is undoubtedly void by the statute of frauds, or rather, an action could not be brought upon it if not in writing, yet it would have been a good defence to any action Van Dyke might have brought for his labor, before it was repudiated by the father. The testator could have set up that these services were performed, to be compensated by the devise; and it would have prevented a recovery by the plaintiff. *Brown on Frauds*, § 122, and cases in note.

But if the contract was repudiated by the testator, and he refused or failed to execute it, then the plaintiff, upon that ground, would be entitled to recover for the worth of his services. 4 *Dutcher* 216 ; *Rutan* v. *Hinchman*, 1 *Vroom* 255 ; *Brown on Frauds*, § 122 ; *Lockwood* v. *Barnes*, 2 *Hill* 131 ; *Canada* v. *Canada*, 6 *Cushing* 15.

Supposing that the father turned the plaintiff away, as must have been the case for the plaintiff to have recovered under the charge, and the testator, by his will, having entirely cut the plaintiff off from any of his estate, the plaintiff would have a right of action for his work performed upon the faith of the contract, up to the time he was obliged to quit. So far, then, as this suit was concerned, the unwritten contract was good enough, and there was no error in the charge in this exception.

The third exception is to this language of the charge : " Upon this subject, Jack says, the old gentleman told the plaintiff to go away, and he went away. If this is

true, and the father had no just cause to order him away, then it was the father's fault." The complaint in the exception is, that the court should have charged, "that if the son had defamed the character of the father by spreading the story that he was guilty of adultery, then the father had a right to send him away." The court did leave the question of just cause to the jury, as appears from the extract in this exception. It is unnecessary now to say whether the proof of testator's adultery, at his own home with his housekeeper, was not so strong as to justify the son in leaving before being ordered away; it is sufficient, in answer to this exception, to say, that there is no legal proof in the case that the son had spread the story of which the executors complain.

The fourth exception is to the charge, "that if you believe the father did not tell the plaintiff to go, then the plaintiff cannot recover, and you need go no further with the case; but if you believe the father did tell the plaintiff to go, then the plaintiff was not to blame for going." The reason alleged for this exception is, "that if the father had told the plaintiff to go, it was a question for the jury whether he had not justifiable ground to discharge him." This charge must be taken in connection with that in the third exception, in which the question of just cause was left to the jury; and a further answer to it is, that there is no evidence in the case of any justifiable cause of discharge to leave to the jury.

The fifth exception is, to what is alleged to be an erroneous statement by the judge of one of the grounds assumed in the defence. There is nothing to show that the court was wrong in what was stated.

The sixth exception is, that the defendants requested the court to charge the jury, that if the jury believed that an agreement was made between the father and son, by which the son was to be paid for his labor by a devise, that such agreement was void by the statute of frauds, and being thus void, the right of action to recover the value of the services rendered began as soon as the labor was performed, and

that, therefore, the claim of the plaintiff was barred by the statute of limitations, unless renewed by a new promise, to which request the court declined to accede, but, on the contrary, charged, whether the agreement was void or not, that did not alter the time the statute of limitations began to run. The right of action, as already shown, where the services were performed in consideration of a devise, the agreement being within the statute of frauds, does not begin as soon as the labor is performed; it does not begin until after default on the other side. There must be a repudiation of the contract, or a failure to perform it, before the action can be brought. Van Dyke left in the winter of 1839 or 1840. If he was then ordered away by the father, the action could not have been brought before that time, if then. Whether the court charged that the right of action commenced when the testator ordered Van Dyke away, or whether it did not commence till after his death, without having made the devise, does not appear in the case. Whatever the charge may have been on that subject, there is no exception to it; but whether it was either way, the fact that the agreement was within the statute of frauds, could not alter the time the statute of limitations commenced to run. It certainly did not commence to run at the time mentioned in the request to charge. The case of *Patterson* v. *Patterson*, 13 *Johns.* 379, referred to by plaintiff's counsel, holds the doctrine, that when compensation is to be made by will, the suit could not be brought till after the death of the testator, for it would be presumed that he would make provision in his will for it. But without adopting that decision as law, of which I have great doubts, it is not necessary to sustain the charge on this exception, that the right of action should have accrued at any later period than after Van Dyke was ordered away. The fact that the contract was not in writing would not in any way affect the question when the statute began to run. If the charge was, that the statute began to run when Van Dyke was ordered away, that would not now affect the claim, because, the jury may have found a new promise

from the evidence of Van Nest; and if it was that it did not begin to run till the death of the testator, no new promise would have been necessary.

The seventh exception is, that the court declined to charge " that if the jury should believe that any contract was originally made between the father and the son, yet, if they believed that a new agreement was entered into between the parties in the spring of 1838, by which the plaintiff ceased to work for his father and worked for himself, that this new agreement rescinded the former one, as being inconsistent with it, without reference to the question of payment, and that the statute of limitations begins to run from the time of such recession." I have examined the evidence both of the defendants and plaintiff carefully, and cannot find that there is any proof to warrant the court in making this charge. The mere fact, if such was the case, that the father permitted Van Dyke to work for himself awhile, in connection with Abraham, upon the farm, is not in itself inconsistent with the contract claimed by the plaintiff. The father may have been willing for Van Dyke to have some of the profits, and yet to leave the contract still unimpaired by it. The evidence would not have warranted the jury in finding that there was any agreement by which the contract had been rescinded. The father may have been willing to dispense with some of the time of his son, and allow it to him, as well as part of the profits of the land, and yet this would not be inconsistent with the previous arrangement. The jury could regard these facts, if such existed, in fixing the time of service and amount of compensation, but these facts alone could not be considered as rescinding the former agreement.

The last exception is, that the judge charged that interest was to be calculated from the end of each year's service to the day of the trial. This whole claim rests upon the common counts for the value of labor performed. The suit is not upon a special agreement performed, but upon the ground that the contract has been repudiated by the testator, and his estate must, therefore, pay for the benefits re-

ceived. The benefit was had, as the work was performed, and interest follows as a part of the plaintiff's damages. The calculation from the end of each year is usual, as well as right, where the work is for several years continuously.

All of the questions raised upon the motion of non-suit, not particularly referred to, are substantially disposed of in what I have said upon the exceptions to the charge. I find no error, and the judgment must be affirmed.

Judgment affirmed.

HAINES, J., concurred.

ELMER, J. (dissenting). Upon the trial of this cause, the court was asked to non-suit the plaintiff, for the reason that he did not commence his suit within three months from the time of being served with notice that his claim was disputed, as required by the second section of the "act for the relief of legatees and next of kin, in the recovery of legacies and distributive shares," approved February 28th, 1849, (*Nix. Dig.* 281.)* A non-suit having been denied, and a verdict rendered to the plaintiff, bills of exceptions were taken to this as well as other rulings of the court, and the case has been argued before us upon these various exceptions. I shall confine my opinion to the question which lies at the foundation of this action: whether, upon the undisputed facts disclosed by the evidence, the creditor brought his suit in time.

For the plaintiff, it is insisted that his suit was brought on the 25th of June, when the attorney says he issued the summons, by sealing it, properly drawn, and dated of that day, and leaving it on his table, which was in due time; while for the defendants, it is insisted that the suit was not brought until the writ was sent to the sheriff, which was some two months after the expiration of three months from the notice.

It appears by the case of *Foster* v. *Bonner, Cowp.* 454,

and other cases, cited in the opinion of the court, that in England, for some purposes, the exhibiting of the bill is considered as the commencement of the suit; but that to avoid the statute of limitations, the true time of issuing the writ may be shown, and the action will be held to be then commenced. In the case of *Whitaker* v. *Turnbull*, 3 *Harr.* 172, it was held by this court, that a suit was actually commenced as soon as the writ was sealed and issued out of the office, in good faith, for the purpose of being served and proceeded on, and that purpose is not afterwards abandoned. The writ, in that case, was presented to the defendant, and he was requested to sign his appearance to the same, and shortly afterwards defendant called, and said his attorney would give an appearance for him, which he did on the same day. The suit was held to have been commenced on the day the writ was issued and shown to the defendant.

In the case before us, the summons was not issued out of the clerk's office, but, in pursuance of the convenient practice in this state, the attorney, by permission of the clerk, signed his name, and affixed the seal, in his own office. Having done this, he left it on his table, where it remained until handed to the sheriff, about five months after the giving of the notice. Had it been actually put in motion to be served, I should have no difficulty in holding that the suit was thereby commenced. But no case in this state, or elsewhere, has gone so far as to treat the mere drawing up, signing, and sealing of a writ in the attorney's office, as of itself the bringing of a suit, although the attorney himself so intended. In the case of *Whitaker* v. *Turnbull*, the writ was not actually sent to the sheriff to be served, but that was done with it, as the Chief Justice remarks, " which was more civil to the defendant, and more effectually apprised him that a suit had been commenced. The writ and the evidence of the plaintiff's demand were both shown to him, and he was distinctly informed of the plaintiff's intention to proceed in the action. In fact the writ was on its way to

the sheriff, by the hand of the attorney, and would have been delivered to him, if the defendant had not stipulated to do that which was equivalent to a service of it by the sheriff."

Nothing of the kind was done in this case. No use was made of the writ. It was merely prepared for use; was never shown to the defendants or their attorney; they were not informed that it had been sealed, nor was it withheld at their request. There were several conversations about an arbitration; but it is not alleged that the defendants or their attorney ever agreed to one, or that they induced the plaintiff's attorney to delay the writ. His mistake was, in supposing that what he did was an actual bringing of a suit, within the meaning of the statute. I cannot so consider it. So to hold would be, in my opinion, to introduce a highly dangerous practice, sanctioned by no precedent, and by no sound principle.

The first section of the act of 1855 (*Nix. Dig.* 664)* does not appear to me in the least to affect this question. The date of the writ is made only *prima facie* evidence that it was issued at that time, but it is expressly enacted that this date may be disproved, as in this case I think it has been.

It has been insisted for the plaintiff, that the plea by which this objection to the suit was made, is so defective as to be bad in substance, so that the court was justified in rejecting it. No such ground as this appears to have been taken at the trial, and if it had been, I think it is not tenable. The plea sets forth that on a day named, an order was made by the Orphans Court of the county of Somerset, according to the statute, directing creditors to bring in their claims within nine months, and that the plaintiff presented to one of the defendants, the acting executor, the claim for which the action is brought, and that the executor disputed the same, and thereupon, on the second day of April, 1859, gave notice in writing to the plaintiff that said claim was disputed, and that said suit was not commenced within three

* *Rev., p.* 855, § 43.

months from the time of giving such notice, and that afterwards the said Orphans Court ordered and decreed that all creditors who had not presented their claims, as required by said order, be barred, &c. To this plea the plaintiff replied that his suit was commenced within three months from the time of the said notice, concluding to the country.

If the plea may be considered technically defective, in not showing the jurisdiction of the Orphans Court of the county of Somerset, to make the orders set forth, or in the absence of any other formality, it might have been amended at the trial. But the replication, by denying and putting in issue only the fact that the suit was not commenced in time, admitted all the other allegations of the plea, and by these it appears, not only that the Orphans Court of the county of Somerset made the orders stated, but that both parties acted under them. The plea is sufficiently intelligible, and good in substance, and it plainly appearing that the action was, in fact, commenced too late, I think the Circuit Court erred in refusing to non-suit the plaintiff, and that the judgment must be reversed.

CITED in *James* v. *Van Horn*, 10 *Vroom* 360; *Prickett* v. *Prickett's Administrators*, 5 *C. E. Gr.* 480; *Gardner's Administrators* v. *Schooley*, 10 *C. E. Gr.* 154.